UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

AIR LIQUIDE AMERICA L.P.,                          )
     Plaintiff/Counterclaim Defendant,          )
                                      )
vs.                                                              )         1:05-cv-1044-LJM-WTL
                                        )
INDEPENDENT WELDING DISTRIBUTOR   )
COOPERATIVE, INC.,                                   )
     Defendant/Counterclaim Plaintiff.          )

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

This cause is now before the Court on defendant/counterclaim plaintiff's, Independent Welding Distributor Cooperative, Inc. ("IWDC"), Motion for Summary Judgment on its counterclaim for breach of contract and anticipatory repudiation against plaintiff/counterclaim defendant, Air Liquide America L.P. ("Air Liquide"), and on Air Liquide's breach of contract claim against IWDC.  This cause is also before the Court on Air Liquide's Motion for Summary Judgment on its breach of contract claim against IWDC.

For the reasons stated herein, the Court **DENIES** IWDC's Motion for Summary Judgment and **GRANTS in part and DENIES in part** Air Liquide's Motion for Summary Judgment.

## I.  BACKGROUND

### A.  THE PARTIES & THEIR AGREEMENT

IWDC is the administrative arm of a not-for-profit corporation that was formed to obtain competitive prices for products used in the welding industry and to pass on cost savings to its

members companies.  Am. Answer, ¶ 31.  In March 2002, IWDC had between 124 and 130 members.  Pyle Dep. at 82-83.

In 2002, IWDC Vice President of Gases, J. Edward Pyle ("Pyle"), was responsible for creating a gas supply program that would benefit IWDC members and meet the objectives of gas manufacturers.  Pyle Dep. at 25-26.  He helped solicit MG Industries ("MG") as a supplier for a cooperative agreement.  Golliday Dep. at 27-28.  On March 26, 2002, IWDC and MG Industries ("MG"), entered into a Cooperative Gas Purchase Agreement (the "Master Agreement").  Def.'s Mot. Summ. J. Ex. 4 ("Def.'s MSJ Ex. 4").[1]  Although the terms of the Master Agreement were negotiated by representatives from both parties, MG "had the major role in drafting" both the Master Agreement and the Participation and Product Supply Agreements ("Supply Agreements") that related to it.  Anderson Dep. at 24; Golliday Dep. at 27; Pyle Dep. at 77, 79, 82; Esposito 30(b)(6) Dep. at 7-8.

IWDC thought that the Master Agreement would provide its members with competitive prices for gases used in welding, namely, liquid argon ("LAR"), liquid oxygen ("LOX"), and liquid nitrogen ("LIN").  Pyle Dep. at 19.  The relevant portions of the Master Agreement state:

> **WHEREAS**, [MG] is in the business of the manufacture and sale of industrial gases;

> **WHEREAS**, IWDC, acting to further the interests of its members, wishes to enter into a contract with [MG] whereby [MG] agrees to sell to IWDC's members

---

[1]Both parties in this cause used numbers to identify exhibits for their respective motions for summary judgment.  In addition, both parties used numbers to identify exhibits they used in opposition to the other party's motion.  The Court has endeavored to cite to a party's exhibit to which the facts in this section refers by identifying the party who proffered the exhibit, whether it was in support of its own motion for summary judgment ("MSJ") or in support of its opposition to the other party's motion for summary judgment ("Opp'n").

2

who execute an Addendum A hereto such members' requirements for [MG's] products;

**THEREFORE**, in furtherance of the foregoing and intending to be legally bound hereby, IWDC and [MG] hereby agree as follows:

**1.   DEFINITIONS**

In this Agreement:

(a)   "Products" means the gas(es) set forth in each respective Addendum A hereto relating to a Participating Member.

(b)   "Participating Member" means a member of IWDC in good standing that executes an Addendum A hereto, which is subject to [MG's] approval.

**2.   PURCHASES**

(a)   [MG] hereby agrees to sell to each Participating Member such Participating Member's requirements for Products on the terms set forth in the Addendum A relating to such Participating Member.  The parties intend that the prices for Products sold to a Participating member will be the price set forth in Exhibit 1 to this Agreement obtained by IWDC for the benefit of its members through arms-length negotiations with [MG].  The foregoing sentence is not intended to alter any provisions regarding price changes set forth in any Addendum A relating to a Participating Member.

(b)   Rebates earned under this Agreement shall be calculated by [MG] and paid to IWDC by the end of the first calendar quarter after the calendar year in which they are earned.  Product [that] was delivered in the year under consideration but for which payment is not made prior to February 1 of the following year will not be included in the calculation of rebates.

(c)   The failure by IWDC, through Participating Member purchases, to purchase, in any given year, at least the Minimum volumes of all Products set forth in Exhibit 2 for that year shall entitle [MG] to cancel the rebate program and impose a surcharge calculated by multiplying the Minimum volume times the surcharge amount for the respective product ($0.10/ccf for LAR and $0.01/ccf for LOX  and LIN).

(d)   Nothing in this Agreement shall be interpreted as limiting [MG's] ability to pursue the direct sale (at prices determined solely by [MG]) to IWDC

3

member companies (who are not Participating Members) of products covered hereby, nor shall such direct sales under existing or subsequent agreements be considered in calculating the quantities purchased for determining rebates earned or satisfaction of Minimum purchase quantities.

(e)     In the event that a Participating Member breaches the terms of its Addendum A, IWDC will, and upon request from [MG] shall[,] vigorously enforce the provisions thereof at IWDC's sole cost and expense.  If IWDC fails, in [MG's] reasonable opinion to properly enforce Addendum A, [MG] shall have the right to do so and be reimbursed by IWDC for all costs and expenses incurred (including reasonable attorneys' fees).

## 3.     INVOICING

(a)  All invoices for Products sold by [MG] to a Participating Member are to be sent to IWDC for processing.  IWDC will process such invoices, will collect payment thereof from the Participating Member, and will in accordance with the terms of such invoices, i.e., net forty-five (45) days, remit payment thereof to [MG]. IWDC agrees to guarantee payment of all amounts due under invoices for Products and services rendered by [MG] and further agrees that [MG] may look to IWDC for payment of all such amounts without the requirement for any demand, presentment or protest and without notice of non-payment thereof.

(b)  All Invoices for surcharges imposed under paragraph 2(c) above will be due and payable 45 days from the invoice date.

* * *

## 5.     TERM

The term of this Agreement begins as of the Effective Date and continues until the later of (a) three years from the Effective Date or (b) the date on which [MG] no longer has obligations under any Addendum A relating to a Participating Member.

* * *

## 7.     GENERAL PROVISIONS

* * *

(c)     Entire Agreement.  This Agreement, together with the Exhibits and Addenda referenced herein, supersedes any prior agreement or agreements between

4

IWDC and [MG] covering the supply of Products to Participating Members, but this Agreement will not be construed as a renunciation or discharge of any claim in damages for an antecedent breach. The entire agreement is contained herein. There are no other oral or written promises, representations or warranties affecting this Agreement. . . .

Def.'s MSJ Ex. 4, ¶¶ 1, 2, 3, 5, 7.

Exhibit 1 to the Master Agreement lists pricing and rebates for various volumes of purchases for each of the three gases, LAR, LIN, and LOX. Def.'s MSJ Ex. 4, Ex. 1, at 1. It specifically notes that LAR is not available in Vacaville, California, and San Diego, California. *Id.* Master Agreement Exhibit 1 also states:

- Oxygen not available at Irwindale, CA
- Oxygen, nitrogen not available at Norfolk
- Argon at Norfolk limited 2 mmcf
- All plants do not have unlimited product available
- Rebates apply to Base Product price only

*Id.*

Exhibit 2 to the Master Agreement sets forth minimum monthly product volumes, calculated annually, for each of the three gases for the years 2002, 2003, and 2004. Def.'s MSJ Ex. 4, Ex. 2. Specifically, the chart reads:

| Year | 2002 | 2003 | 2004 |
|------|------|------|------|
| Argon | 7,500,000 scf | 22,500,000 scf | 45,000,000 scf |
| Oxygen | 18,750,000 scf | 45,000,000 scf | 75,000,000 scf |
| Nitrogen | 18,750,000 scf | 45,000,000 scf | 75,000,000 scf |

*Id.*

As stated in the Master Agreement, an IWDC member could enter into a Supply Agreement with MG to purchase welding gases from MG at stipulated prices for at least three years from the

5

date of the Supply Agreement.  Def.'s MSJ Ex. 4, ¶¶ 1, 2, 5.  Once a member signed a Supply

Agreement, they became a "Participating Member."  *Id.*

The following IWDC members entered into Supply Agreements with MG:  A-Ox Welding

Supply Co.; Ann Arbor Welding Supply; Depke Gas & Welding Supplies; Fresno Oxygen; Gases

Plus; Metro Welding Supply Corporation; Modern Supply Company; Ohio Air Products; R.N. Goss;

Scott Gross Company; Sunnox; Sutton-Garten Company; United Welding Supply; Urie & Blanton;

Weiler Welding co.; Welder's Supply; and Wyandote Welding Supply.[2]  Def.'s MSJ Exs. 5-13;

Docket No. 124, Cntrclms. ¶ 36.  A-Ox Welding Supply Co. signed the first Supply Agreement on

March 21, 2002, and Modern Supply Company signed the last one on June 21, 2004.  Def.'s MSJ

Exs. 5 & 13.  At least fourteen Supply Agreements are still in effect.  Def.'s MSJ Ex. 1.

Generally, under a Supply Agreement, MG agreed to sell gases used for welding to each

Participating Member according to that member's needs as set forth in the Master Agreement and

the Participating Member's Supply Agreement.  Pyle 30(b)(6) Dep. at 11-12.  The required

specifications for each Participating Members is detailed in the Supply Agreement and the attached

riders.  Def.'s MSJ Exs. 5-13.  Specifically, each Supply Agreement, except that for A-Ox Welding

Supply Co.,[3] states, in relevant part:

> 7.   SPECIFICATIONS
> All Product(s) delivered by [MG] under this Agreement shall conform to the
> specifications set forth on Attachment(s) "A".

---

[2]Other members also joined, however, some of them were eventually supplied gas by
another supplier when Air Liquide purchased MG.  Denney 30(b)(6) Dep. at 71-72.

[3]The Supply Agreement for A-Ox Welding Supply Co. does not include paragraphs b.
and c. of the PRODUCING FACILITIES AND QUANTITY LIMITATIONS section.  Def.'s
MSJ Ex. 5.

\* \* \*

9.  PRODUCING FACILITIES AND QUANTITY LIMITATIONS
    a.  Seller's specification, price and delivery obligations are predicated on furnishing Buyer's requirements of Product(s) from [MG's] facility closest to the Designated Location(s).

    b.  [MG] shall not be obligated to supply Buyer's requirements for Product(s) [1] in excess of the lower of 130% of Buyer's estimated requirements as set forth on Attachment(s) "A" or 130% of Buyer's average monthly purchases in the immediately preceding four (4) month period, or [2] in the event of a force majeure situation as outlined in Section 15.  Seller shall however, endeavor to make such additional deliveries provided Buyer shall pay Seller any and all additional costs associated with [MG] making such deliveries.

    c.  If Buyer shall have requirements for Product(s) which [MG] is unable to supply under this Section or Section 15 hereof, Buyer may, with [MG's] written approval (which approval shall not be unreasonably withheld), purchase such requirements from other qualified vendors and have the same delivered into Equipment during such period of [MG's] inability. . . .

\* \* \*

12.  SELLER'S AND [MG'S] WARRANTY
     Seller and [MG] warrant that the Product(s) delivered to Buyer shall conform to the specification set forth on Attachment(s) "A", and that, at the time of delivery, [MG] shall have good title to and the right to transfer such Product(s), and that the same shall be delivered free of encumbrances.

\* \* \*

15.  FORCE MAJEURE

\* \* \*

     b.  If sufficient Product(s) from [MG's] normal source of supply becomes unavailable, [MG] may allocate Product(s) among its various customers, and will make every reasonable effort to obtain Product(s) from other sources, provided Buyer agrees to pay all additional costs associated with such Product(s).

* * *

16.    GENERAL PROVISIONS

* * *

      h.  IWDC and Member further agree that in the event of a termination of the [Master Agreement], any failure of IWDC to meet any of the Minimum Monthly Volumes as defined and set forth in Exhibit 2 to the [Master Agreement], or a breach of the [Master Agreement] by IWDC or Member, [MG] shall, in addition to the rights available to [MG] in law or equity, have the right, in its discretion and upon notice to IWDC and Member, to have the Product Supply Agreement assigned to [MG] such that the Product Supply Agreement shall from that point forward, be a direct supply agreement between [MG] and Member; it being understood and agreed by Member that any rebates provided under the [Master Agreement] will, upon such assignment, be canceled retroactive to the first of the calendar year for which rebates have not yet vested.   In addition to any price adjustment provided under the Product Supply Agreement, [MG] shall have the further right each year to adjust prices set forth in the Product Supply Agreement by $0.10 ccf for Liquid Argon and $0.01 per ccf for Liquid Oxygen and Liquid Nitrogen upon any such assignment, such adjustments to apply cumulatively.

Def.'s MSJ Ex. 6.

In January 2004, Air Liquide announced that it was going to acquire MG.  Kuefler Dep. at 46; Golliday Dep. at 123-24.  In May 2004, Air Liquide's management took over MG while the Federal Trade Commission ("FTC") reviewed the proposed acquisition.  Golliday Dep. at 126-27.  The FTC did not approve the acquisition until November 2004.  Golliday Dep. at 127-28.  By January 2005, Air Liquide had assigned the Master Agreement to itself from MG and had assumed MG's obligations and duties under the Master Agreement and the Supply Agreements. Pyle 30(b)(6) Dep. at 226.

8

Air Liquide had a reputation of being particularly litigious and preferring to sue rather than to engage in negotiations to resolve disputes. *Id.* at 23. Apparently, at least one IWDC member, Sims Welding, did not sign a Supply Agreement because it knew of this reputation. *Id.* at 20-22. At least one other IWDC member, Rockford Industrial Welding Supply, Inc. ("Rockford"), did not sign a Supply Agreement at the time of the acquisition of MG by Air Liquide because Rockford's management was concerned about how the sale would affect the Master Agreement. *Id.* at 46-52; Bertrand Decl. ¶¶ 4-5.

Moreover, Air Liquide's business model was to deal directly with distributors, not via third-parties such as IWDC. Kuefler Dep. at 62-65; Pyle 30(b)(6) Dep. at 23-24, 58, 209; Def.'s MSJ Ex. 62. Prior to its assumption of the Master Agreement with IWDC in January 2005, Air Liquide had never entered into or been a part of any third-party agreement. Kuefler Dep. at 67-69. Rather, until that time Air Liquide only dealt directly with independent distributors and was only interested in direct dealings with such distributors. Kuefler Dep. at 69.

## B. THE PARTIES' COURSE OF DEALING

After the first effect year of the Master Agreement, MG notified IWDC that it failed to purchase the minimum volumes required by the contract and that IWDC owed surcharges as a result of that failure. R. Bolenbaugh Dep. at 184; Pl.'s Opp'n Ex. 28, at IW 1074. A letter dated September 10, 2003, from MG to then-President of IWDC, Roger Bolenbaugh ("Bolenbaugh"), stated, in part:

> This will confirm our discussions at our July 7, 2003[,] meeting regarding the first year of participation in the IWDC/MG Gas initiative. While we remain excited and enthusiastic regarding the long term benefits of the program for the IWDC

members and for [MG], the targeted minimum purchases as described in the [Master Agreement] for year 1 were not achieved.  The calculations we reviewed at our meeting are attached for your reference.

In accordance with paragraph 2.(c) of the Agreement, MG would have the right to cancel the rebate program and impose a surcharge calculated by multiplying the minimum monthly volumes (calculated annually) from Exhibit 2 times the surcharge listed in the Agreement.  Based on the calculations, the amount that would be due MG for the first year is $135,000.00 as indicated below.

* * *

During our meeting of July 7, we discussed several ideas regarding how the IWDC can satisfy this obligation and move the program forward with mutual benefits.  Among the approaches discussed were the following:

1.      MG increases product prices beyond what are in the Agreement, resulting in MG recovering an amount equal to surcharge;

2.      IWDC members agree to purchase additional products, such as Helium and speciality gases, equal to agreed sales revenue amount;

3.      IWDC pursues gas initiative more aggressively gaining targeted volumes.  If year 2 minimums are met, the year 1 surcharge will be forgiven.  If at the end of year 2, IWDC has not purchased the required minimum monthly volumes, the original surcharge, plus interest, will be due as well as the surcharge for year 2;

4.      MG invoices IWDC and IWDC invoices its members for the $135,000.00 surcharge.

We discussed selecting one or more of the above options to satisfy the Agreement and move forward.  The idea of supplementing additional products is appealing because it adds depth to the program in general.  Perhaps a combination of more products and product price increases may work.  We would like to resolve this issue at the earliest date in order to move the program forward to mutual benefit.  Please review the information and contact me so we can resolve this issue.  We value our relationship with the IWDC and look forward to working with you in the future.

If we do not resolve this matter by October 15, 2003, however, MG will invoice IWDC for the surcharge and expect payment in accordance with the terms of the Agreement.

10

Pl.'s Ex. 28.

IWDC responded by undated letter in which it outlined at least ten reasons why it could not have met the "projected volumes" in the Master Agreement.  Pl.'s Opp'n Ex. 33.  The ten listed reasons were:

1. The impending sale of [MG] since the onset of this program has made IWDC members cautious of entering into a long term contract with [MG].

2. The USA economy, overall, is worse than forecasted and continues to struggle.  The result has been that projected volumes are far less than originally expected.

3. The success of the joint [MG] and IWDC program, in conjunction with the bad economy, has resulted in other gas manufacturers taking major competitive steps to counter our initiative.  This recourse, with their major accounts, although not unexpected is starting to undercut our joint efforts towards expanding the gas program.  This action was discussed prior to the beginning of our program and we have not been able to totally counteract it.

4. The IWDC thought we had the understanding that pre-signed business was to count towards our volume goals.

5. Both the IWDC and [MG] used volume data provided by our members.  Neither party could have anticipated a situation such as Scott Gross, for example, badly missing target volumes due to a poor economy and severe competitive pressure.

6. MG turning down third party business for oxygen and nitrogen [] due to competitive pricing and tank size issues.  Business that was made available but then serviced through competition.

7. Unable to reach specific members such as Lake Welding in Muskegon, Michigan.  Prior to signing this agreement we had not considered geographic limitations when assigning volumes to our agreement.

8. MG was unable to provide [LAR] to Fresno Welding Supply in Fresno, CA due to the inability to analyze the product for krypton.

9. Together we were unable to complete the signing of Weiler Welding Supply due to a mutual misunderstanding of the existing IWDC agreement.

10. The volumes targeted for the rebate were mutually agreed upon as achievable. Since this entire concept was totally new, no history was available to compare or verify usages. Nor could the effect on volumes due to competitor reaction be planned. The targeted volumes were done in good faith and with the best information available. This was discussed during our initial negotiations.

*Id.* The letter also contained IWDC's counteroffer in response to MG's suggestions on how to resolve the minimum volume issue. *Id.*

By letter dated December 8, 2003, IWDC sent reforecasted volume numbers to MG. Pl.'s Opp'n Ex. 5. In this letter, IWDC noted:

Factors, such as current market conditions, members who after committing to the gas program and did not follow through [sic], recourse of competitive companies, as well as the continuing questions surrounding the divestiture of MG during 2004 have all effected our ability to meet volume expectations. To add fuel to the fire, the penalty clause in our [A]greement has become an issue, which has to be overcome before some members decide that they will join in the MG/IWDC program.

*Id.*

By letter dated April 2, 2004, IWDC sent a proposed redrafted Master Agreement to MG in which IWDC stated that it would sign the amended Master Agreement if the volume commitments were eliminated. Pl.'s Opp'n Ex. 6. IWDC listed the following support for its offer:

✓ Based on current business activity through MG's Norfolk facility, Gases Plus has been advised their required argon commitment cannot be met.

✓ Borderland, has a need for 4mccf per month of industrial oxygen delivered to Loredo, TX[.] Your representative Don Schulz has advised us that the plant is sold out.

✓ Bemidji Welders Supply, Inc. out of Bemidji, MN[,] is only waiting for the Norfolk Plant to be certified for USP oxygen and NF nitrogen. As soon as that cerficiation is received from the FDA they want to start picking up 1 mccf per month of argon, 1.5 mccf per month of oxygen and 750,000 ccf per month of nitrogen. Will we be able to meet this requirement with MG or be forced to go elsewhere?

12

✓     Gordon Woods, North Hollywood has requirements for 1.8m ccf per month of argon, 6m ccf per month of oxygen and a large requirement for nitrogen. Will Irwindale be capable of supplying this requirement?

✓     The pending sale of MG to Air Liquide is preventing some members [from] signing the MG agreement, as they are reluctant to have Air Liquide as a supplier.

The IWDC is not yet convinced that Air Liquide will honor the IWDC/MG relationship beyond the existing agreements. With this major unknown it is impossible to guarantee volume growth. Air Liquide is now in the market with predatory pricing to IWDC members, and has been successful in signing some. This is strong indication to IWDC that Air Liquide may not continue the program we have started. This has made it necessary for the IWDC to start the process of seeking backup bulk vendors. All of the factors discussed above are distractions and are prohibiting the IWDC from being able to purchase the additional volumes you have requested. The IWDC has no objection to extending our existing agreement with the above-mentioned paragraphs removed.

*Id.*

Apparently, nothing was resolved because on May 19, 2004, MG sent then-President of IWDC, Roger Neu ("Neu"), another letter regarding the failure of IWDC to meet the year two requirements under the Master Agreement. Pl.'s Opp'n Ex. 29. The May 19, 2004, letter stated, in part:

This will confirm our ongoing discussions regarding the second year participation in the IWDC/MG Gas initiative. We successfully moved the program forward again this year, bringing our total distributor commitment to [twenty-four] members, so far. Unfortunately the IWDC did not meet the minimum targeted purchases as outlined in our [A]greement. The calculations are included for your reference.

In accordance with paragraph 2.(c) of the [A]greement, [MG] would have the right to cancel the rebate program and impose a surcharge calculated by multiplying the minimum monthly volumes (calculated annually) from Exhibit 2 by the surcharge amounts listed in the Agreement. Based on the calculations, the amount that would be due to MG for the second year is $378,000.00 as indicated below.

\* \* \*

13

We have discussed and presented the third amended proposal with the IWDC in an attempt to resolve the minimum volume performance provision. After Ed Pyle and I initially agreed to new volumes and individual new member commitments to satisfy all parties, the amendment was rejected by IWDC. This is disappointing from the standpoint that the amendment presented by MG essentially eliminated the minimum volume expectations in an attempt to remain flexible, while providing mutually beneficial results for all.

The amounts that would be due to MG for the year 1 [sic] and year 2 are $513,000.00. We are now engaging in year [3] with no resolution in [sight]. I would ask that you please review this issue, as we must resolve to satisfactory results. While we agreed to withhold the first year billing until we reviewed an alternative solution, we must now resolve both years' obligations. I would like to resolve this by June 15th. Please review this and respond with your thoughts.

*Id.*

After Air Liquide became responsible under the Master Agreement in January 2005, by letter dated April 14, 2005, and by Invoice dated April 12, 2005, Air Liquide demanded payment from IWDC for surcharges Air Liquide alleged were due under the Master Agreement for the years 2002 and 2003. Ladd Decl. Ex. 1. By letter and Invoice both dated April 29, 2005, Air Liquide demanded payment for surcharges it alleged IWDC owed under the Master Agreement through March 2005. *Id.* The letter dated April 14, 2005, also notified IWDC of Air Liquide's intent to invoke paragraph 16(h) of the Supply Agreements and assign those agreements to Air Liquide. *Id.* Such assignment would become effective upon notice to the IWDC Participating Members. *Id.*

On July 15, 2005, Air Liquide filed the instant action alleging that IWDC breached the Master Agreement by failing to meet the minimum purchase requirements and by failing to pay the surcharges thereunder.

By letters dated September 13, 2005, Air Liquide notified IWDC and Participating Members of its intent to assign the Supply Agreements to Air Liquide; said agreements would then replace the

14

Master Agreement and Air Liquide would supply each Participating Member directly.  Pl.'s Opp'n

Exs. 21 & 30.  IWDC stopped receiving its invoicing fee on September 13, 2005, when Air Liquide

issued these letters and started billing Participating Members directly.  Denney Dep. at 108-10, 116-

17; Kuefler Dep. at 108; Pyle 30(b)(6) Dep. at 243.


### C.  ALLEGED SUPPLY ISSUES

IWDC claims that MG failed to supply requisite gas requirements under the Master

Agreement and the corresponding Supply Agreements such that IWDC was prevented from meeting

the minimum targets in the Master Agreement.  Specifically, IWDC claims that Borderland was an

IWDC member that wanted to enter into a Supply Agreement but could not because MG's San

Antonio, Texas, facility did not have the capacity to supply Borderland's needs in Laredo, Texas.

Pyle 30(b)(6) Dep. at 12-17, 80; Ingham Dep. at 18-20; Schulz Dep. at 73-75, 150-51.

Bemidji Welders Supply was interested in entering into a Supply Agreement, however, MG

could not produce medical-grade LOX or LIN.  Pyle 30(b)(6) Dep. at 34037; Schulz Dep. at 75-77.

Bemidji Welders Supply decided not to buy LAR through a Supply Agreement because it could not

also get the LOX and LIN it needed.  Pyle Dep. at 36.

Richard Kropp ("Kropp"), former Purchasing Agent at A-Ox Welding, declares that in March

2002 and July 2002 he signed Supply Agreements on behalf of A-Ox Welding.  Kropp Decl. ¶ 7.

Kropp contends that during the three years from 2002 through 2005, A-Ox Welding had several

supply issues under the Supply Agreement that included late shipments, missed shipments and

having to purchase gases from other suppliers.  Id. ¶¶ 9-14.  A MG internal memorandum suggest

that LAR supply to A-Ox was a problem from at least August through November 2004, Def.'s MSJ

15

Exs. 35-43; however, A-Ox Welding does not have any documents to support Kropp's allegations that A-Ox Welding experienced disruptions because of MG's LAR supply issues prior to March 2005. Elliott Decl. ¶¶ 14-15. A-Ox Welding's records indicate that in late 2004, when LAR was unavailable from MG's Norfolk facility, A-Ox Welding purchased the gas from a Texas-based manufacturer. *Id.* ¶ 11. A-Ox Welding paid less per standard cubic foot for the LAR from the Texas-based manufacturer, but paid additional transportation costs for the material. *Id.* ¶ 12. A-Ox Welding never alleged that MG or Air Liquide breached the Supply Agreement because of LAR supply issues. *Id.* ¶¶ 17-18. IWDC does not know whether or not it would have met its minimum volume requirement for any of the contract years had MG supplied all of the orders for LAR that A-Ox Welding had requested but had to obtain elsewhere. Pyle 30(b)(6) Dep. at 81.

Similar to the situation with A-Ox Welding, Gases Plus in Gillette, Wyoming, also experienced supply issues concerning LAR from MG's Norfolk, Nebraska, plant. Pyle 30(b)(6) Dep. at 105-20. Gases Plus obtained LAR from another supplier at a higher cost when MG was unable to meet its requirement. Wahe Dep. at 22-25, 36-36, 53; Aarsby Dep. at 32-42. Gases Plus also wanted to purchase LOX and LIN from MG, however, these gases were not available at the time Gases Plus signed a Supply Agreement. Pyle 30(b)(6) Dep. at 106. Gases Plus never alleged that MG or Air Liquide breached the Supply Agreement because of its LAR supply issues. Aarsby Dep. at 54. IWDC does not know if it would have hit its minimum volume requirements if all of Gases Plus' LAR orders had been fulfilled. Pyle 30(b)(6) Dep. at 110.

Sometime in mid-2005, Scott-Gross Company, another Participating Member, had supply problems for LOX from MG/Air Liquide's Middletown, Ohio, plant. Def.'s MSJ Exs. 55-57. During that period, Scott-Gross Company obtained its LOX from another supplier. *Id.* However,

Scott-Gross Company has no documentation indicating that either MG or Air Liquide failed to provide it with complete shipments of LAR, LIN, or LOX, between January 2003, and March 2005, as provided in the relevant Supply Agreement.  Scott Aff. ¶¶ 6-7.

In April 2005, United Taylor Welding Supply Co., Inc. ("United Taylor Welding"), reported to IWDC that it had been unable to get full deliveries of LAR for its 3000-gallon bulk tank.  Def.'s MSJ Ex. 53.  Apparently, in September 2005, United Taylor Welding experience another issue when Air Liquide improperly delivered LOX.  Def.'s MSJ Ex. 54.  However, according to United Taylor Welding's President, Jay Smigen ("Smigen"), United Welding did not experience problems with the quality or quantity of LAR, LIN, or LOX, supplied to it by MG or Air Liquide such that it caused United Taylor Welding to seek another supplier for those gases.  Smigen Decl. ¶ 7.  Moreover, there was never an incident in which United Taylor Welding chose not to purchase bulk gases from MG or Air Liquide under the relevant Supply Agreement.  *Id.* ¶ 8.

In 2002, Weiler Welding Company became a Participating Member and signed a Supply Agreement to purchase LAR and LIN from MG's Middletown, Ohio, facility.  Weiler Decl. ¶¶ 4-5.  In late 2004, Weiler Welding sought to purchase additional LIN that had not been agreed upon in the relevant Supply Agreement.  *Id.* ¶¶ 7-8.  MG did not have the capacity to fulfill this need; therefore, Weiler Welding purchased the necessary additional allotment from another bulk LIN manufacturer.  *Id.* ¶¶ 9-10.

Although MG and IWDC attempted to sign Rockford Industrial to a Supply Agreement, Gary Bertrand ("Bertrand"), President of Rockford Industrial, declared that the company chose not to become a Participating Member because Bertrand was concerned that MG's pending sale to Air Liquide may have an affect on the Master Agreement.  Bertrand Decl. ¶ 4.

17

Fresno Oxygen signed a Supply Agreement to purchase LOX, LIN, and LAR from MG. Def.'s MSJ Ex. 7. The contract specified that the LAR would be 99.997% pure. *Id.* Before Fresno began purchasing LAR under the Supply Agreement, however, it had one of its customer's analyze the gas to see if it met that customer's stringent criteria for krypton. Barnes Dep. at 27-28. MG's LAR did not meet that customer's criteria; therefore, Fresno Oxygen did not purchase any of its LAR requirement from MG. *Id.* at 29.

In late 2004, Welders Supply in Charlotte, North Carolina, a Participating Member, experienced a problem with the quality of MG's LAR that was delivered to one specific customer. Spencer Dep. at 52. MG tested the gas and found that the LAR had an increased oxygen content. *Id.* at 56-59. MG also had the material tested at an independent lab. *Id.*; Def.'s MSJ Ex. 51. As a result of the problem, MG provided Welders Supply with a credit. Sprouse Dep. at 44, 63-66, 73; Def.'s MSJ Ex. 52.

## II. <u>STANDARDS</u>

### A. SUMMARY JUDGMENT

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990). Motions for summary judgment are governed by Federal Rule of Civil Procedure 56 (c) ("Rule 56(c)"), which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996).  It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which she relies.  *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).  When the moving party has met the standard of Rule 56, summary judgment is mandatory.  *See Celotex*, 477 U.S. at 322-23; *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996).  The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John*

*Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

## B.  CONTRACT CONSTRUCTION

When the terms of a contract are clear and unambiguous, a court will not look to extrinsic evidence, but rather, will simply apply the contract provisions as written. *See, e.g.*, *Stout v. Kokomo Manor Apartments*, 677 N.E.2d 1060, 1064 (Ind. Ct. App. 1997). "It is an elemental principle of the law of contracts that when the agreement of parties is reduced to writing all prior negotiations between the parties are merged into the written agreement." *Nash v. Thomas*, 110 N.E.2d 355, 357 (Ind. Ct. App. 1953). In these circumstances, the intent of the parties should be determined by the language employed within the four corners of the document giving the words contained therein their plain, usual, and ordinary meaning. *See OEC-Diasonics, Inc. v. Major*, 674 N.E.2d 1312, 1315 (Ind. 1996); *Samar, Inc. v. Hofferth*, 726 N.E.2d 1286, 1290 (Ind. Ct. App. 2000). Further, evidence of prior expectations and conversations cannot alter the terms of a written agreement between the parties. *See, e.g.*, *Seastrom, Inc. v. Amick Const. Co., Inc.* 315 N.E.2d 431, 433 (Ind. Ct. App. 1974) (internal citations omitted). Moreover, "construction of a written contract is a question of law for the trial court for which summary judgment is particularly appropriate." *Noble Roman's, Inc. v. Pizza Boxes, Inc.*, 835 N.E.2d 1094, 1098 (Ind. Ct. App. 2005) (citing *Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 613 (Ind. Ct. App. 2000), *trans. denied*).

# III. DISCUSSION

## A. BREACH OF CONTRACT CLAIMS

The Court notes at the outset of this discussion that there is no material issue of fact on whether or not IWDC failed to meet the volume requirements in the Master Agreement. The questions are whether MG and/or Air Liquide breached the Master Agreement first and whether there is any other reason to relieve IWDC from its obligations under the Master Agreement.

The Court concludes that the plain language of the Master Agreement and the Supply Agreement resolves the parties' competing breach of contract claims in favor of Air Liquide. The terms of the Master Agreement provide that in exchange for minimum volume commitments from IWDC, MG/Air Liquide, agreed (1) to provide LAR, LOX and LIN, (2) to the extent MG/Air Liquide had available capacity (3) that would meet IWDC's member's requirements as set forth in the Supply Agreements, (4) at the specific prices set forth in the Master Agreement. Exhibit 1 to the Master Agreement clearly limits MG and Air Liquide's ability to supply the required gases. It states, in relevant part:

- Oxygen is not available at Irwindale, CA
- Oxygen, nitrogen not available at Norfolk
- Argon at Norfolk limited 2 mmcf
- All plants do not have unlimited product available

Def.'s MSJ Ex. 4, Ex. 1, at 1. It also notes that LAR is not available out of Vacaville, California, and San Diego, California. *Id.* Similarly, paragraph 9 of the Supply Agreements limits MG/Air Liquide's obligation to supply gases to individual members based on the location of MG/Air Liquide's "facility closest to the Designated Location(s)." Def.'s MSJ Ex. 6, ¶ 9. In addition, the Supply Agreements provide that a member may have to obtain its needed gas from a different

supplier if MG/Air Liuqide was unable to supply the member itself. *Id.* ¶¶ 9, 15.  As a result of these provisions, IWDC's allegations that MG/Air Liquide's inability to supply certain members or Participating Members during the term of the Master Agreement was a breach of the Master Agreement fails.

Furthermore, there is no evidence that the users of gases under the Supply Agreements or IWDC itself ever considered either MG or Air Liquide in breach of the Master Agreement because of a quality issue.  Rather, any actual quality issue was quickly resolved by MG/Air Liquide or, the IWDC member recognized that MG/Air Liquide could simply not meet the stringent requirements of its customers.  IWDC makes much of the fact that MG/Air Liquide could not meet the krypton requirements of Fresno Oxygen's one LAR customer.  But there is no allegation that the LAR that MG/Air Liquide could have supplied at the time did not meet the specification agreed to by MG/Air Liquide in the relevant Supply Agreement.

In addition, IWDC seems to assert that the impending sale of MG to Air Liquide, was a breach by MG and/or Air Liquide that prevented IWDC from meeting its minimum purchase commitments.  However, IWDC ignores the fact that it failed to meet its minimum purchase requirements in the first year.  Although the parties tried to re-negotiate the Master Agreement to either eliminate or reduce those minimum purchase requirements, no agreement was ever reached and the Master Agreement remained in effect.  In other words, IWDC breached the Master Agreement before the sale of MG ever became an issue.

Additionally, the Court is at a loss as to how MG or Air Liquide could have breached the Master Agreement based on the fact that MG was sold to Air Liquide.  During the sale period either MG or Air Liquide was ready to supply IWDC members with their gas requirements, to the extent

22

the other supply parameters in the Master Agreement and Supply Agreements were met. A member's choice not to proceed cannot be attributed to MG or Air Liquide as a breach when no provision of the Master Agreement required MG or Air Liquide to do more than make gas available at the agreed upon price.

IWDC also contends that the Master Agreement is unenforceable because it was not the result of arms-length negotiations between two sophisticated parties, it is one-sided in favor of MG and/or Air Liquide, and it is ambiguous. The Court disagrees with each of these assertions. First, there is no dispute that the Master Agreement and its associated exhibits and Supply Agreement were negotiated by IWDC's Vice President, Pyle, and President, Roger Bolenbaugh ("Bolenbaugh"), and by MG's George Golliday ("Golliday"). Golliday Dep. at 27; Pyle Dep. at 77, 79, 82. It is equally undisputed that Pyle testified that he based his input in the Master Agreement upon his industry experience. Pyle Dep. at 113. Thus, there is no evidence to support IWDC's argument that its representatives were unsophisticated.

Second, the Master Agreement is not one-sided such that it binds only IWDC and not MG. Rather, MG had obligations to meet the requirements of IWDC members who chose to enter into a Supply Agreement within the parameters outlined both in the Master Agreement and in the Supply Agreement. After negotiating the terms of the contract, including the provisions that identified where MG had supply issues and the provisions that limited the circumstances under which MG was willing to contract with any given member, IWDC cannot now complain that its estimates based on these criteria were wrong, therefore, MG and Air Liquide are liable. IWDC presents no evidence that it did not have an opportunity to comment upon or negotiate the terms of the relevant agreements.

Third, the Master Agreement, as illustrated in the discussion above, is not ambiguous.  Of particular note is the surcharge provision.  IWDC asserts that both Golliday and Pyle had a different view of how the surcharge provision should apply.  Moreover, Bolenbaugh asserts that he thought MG had waived its right to collect under the provision when it never invoiced IWDC for the surcharge within a reasonable period after the various contract years had ended.  IWDC contends that these viewpoints illustrate that the surcharge is ambiguous on its face because it does state upon whom the surcharge will be placed and how it would be calculated.  At the very worst, IWDC asserts, the surcharge provision is an unenforceable liquidated damages provision with no relation to the actual damages suffered by MG/Air Liquide as a result of any IWDC breach.

The surcharge provision reads:

> (c)     The failure by IWDC, through Participating Member purchases, to purchase, in any given year, at least the Minimum volumes of all Products set forth in Exhibit 2 for that year shall entitle [MG] to cancel the rebate program and impose a surcharge calculated by multiplying the Minimum volume times the surcharge amount for the respective product ($0.10/ccf for LAR and $0.01/ccf for LOX  and LIN).

Def.'s MSJ Ex. 4, ¶ 2(c).  There is no ambiguity about who is responsible for paying the surcharge because the provision appears in the Master Agreement, which is an agreement between IWDC and MG.  Therefore, it is IWDC's obligation to pay the surcharge under this clause.  Furthermore, there is no question about how to calculate the surcharge.  The clause specifically states that the imposed surcharge is "calculated by multiplying the Minimum volume times the surcharge amount for the respective product ($0.10/ccf for LAR and $0.01/ccf for LOX and LIN)." *Id.*  There is no ambiguity; the Minimum volumes of each product were set forth in Exhibit 2 and specifically referenced by this provision.

24

In addition, the term "year" is not ambiguous.  In this contract provision, the term "year" refers to a contract year, or the year following the anniversary date of the Master Agreement.  That this is a correct reading of the term is evidenced when the word is read in the context of the Master Agreement as a whole because the term of the agreement is defined to begin "as of the Effective Date and continues to the later of (a) three years from the Effective Date or (b) the date on which [MG] no longer has obligations under any Addendum A relating to a Participating Member."  *Id.* ¶ 5.  In other words, the term is a year after the effective date; hence, the term "year" in this paragraph means a contract year.

The Court can also not agree with IWDC that the surcharge is an unenforceable penalty.[4] Under Indiana law, the question of whether the surcharge is a proper liquidated damages provision or a penalty is one of law for the Court.  *See Time Warner Entm't Co., L.P. v. Whiteman*, 802 N.E.2d 886, 894 (Ind. 2004); *Gaddes v. Stardust Hill Owners Ass'n, Inc.*, 804 N.E.2d 231, 236 (Ind. Ct. App. 2004); *Nylen v. Park Doral Apartments*, 535 N.E.2d 178, 184 (Ind. Ct. App. 1989).  The Court should consider

> ". . . the facts, the intention of the parties and the reasonableness of the stipulation under the circumstances . . . ." [*Gershin v. Demming*, 685 N.E.2d 1125, 1127 (Ind. Ct. App. 1997).]  If the sum sought by a liquidated damages clause is grossly disproportionate to the loss that may result from a breach of contract, [the Court] should treat the sum as a penalty rather than liquidated damages. *Rogers v. Lockard*, 767 N.E.2d 982, 991 (Ind. Ct. App. 2002).  "Liquidated damages provisions are

---

[4]The Court agrees with IWDC, however, that the Master Agreement is not in the nature of a "take-or-pay" contract where IWDC has agreed to pay for the minimum quantity of gas regardless of whether or not its members take it.  *See, e.g.*, *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Ks.*, 489 U.S. 493, 501 (1989) (discussing, generally, the nature of a "take-or-pay" contract in the gas market).  Rather, the surcharge provisions is in the nature of a liquidated damages provision in which IWDC will pay an amount to compensate MG/Air Liquide if IWDC does not meet the minimum volume requirements of the Master Agreement and thereby is in breach of the agreement.

generally enforceable where the nature of the agreement is such that when a breach of contract occurs the resulting damages would be uncertain and difficult to ascertain." *Gershin*, 685 N.E.2d at 1127. However, to be enforceable the stipulated sum must fairly be allowed as compensation for the breach. *Id.* at 1127-28. Additionally, [the Court] construe[s] any contract ambiguity against the party who drafted it. *Rogers*, 767 N.E.2d at 990. If there is uncertainty as to the meaning of a liquidated damages clause, classification as a penalty is favored. *Id.* at 992.

*Time Warner Entm't*, 802 N.E.2d at 894 (quoting *Olcott Int'l & Co. v. Micro Data Base Sys.*, 793 N.E.2d 1063, 1077 (Ind. Ct. App. 2003), *trans. denied*, 804 N.E.2d 760 (Ind. Dec. 18, 2003) (table)).

In the case at bar, the facts, intention of the parties and reasonableness of the clause all suggest that the pre-set surcharge for each year IWDC failed to meet its minimum volume was a proportionate estimate of resulting damages and not a penalty. From a view of the relevant evidence, the Court can only conclude that it was reasonable for Air Liquide to include the surcharge because of the nature of its agreement with IWDC and the difficulty of determining actual damages. This was the first time that any agreement of this type had been entered by either party; therefore, the damages caused by a breach by either party had no historical precedent. In addition, the fact that the surcharge is constant, regardless of how close IWDC came to reaching its minimum volume, is not unreasonable because the surcharge represents only 6.3% of the total dollar amount that IWDC otherwise would have owed Air Liquide had IWDC made up its shortfall by purchasing the agreed minimum volumes. Ladd Decl. ¶ 19. In other words, the surcharge is less than the projected profits MG/Air Liquide would have earned had IWDC fulfilled its obligation under the Master Agreement.[5]

---

[5]IWDC also points out that Air Liquide never disclosed a damages expert. There is no case, however, that requires the testimony of a damages expert to support a liquidated damages clause. In this case, IWDC has presents no facts to contradict the declaration of Gary Ladd ("Ladd"), Air Liquide's ALNET Business Manager, on this particular issue. Mere conclusory allegations will not support a finding in IWDC's favor. *See Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006), *cert. denied*, 127 S. Ct. 1331 (2007).

Finally, the Court concludes that the surcharge is not barred by the doctrine of laches because, although MG was willing to negotiate a settlement with IWDC, an agreement on a modified Master Agreement was never reached.  In addition, MG addressed the surcharge with IWDC shortly after the first effective year of the Master Agreement and consistently asserted its continued right to impose the surcharge after each contract year passed both without IWDC having reached its minimum volumes and without settlement of its claim to the prior year's surcharge.  Moreover, Air Liquide did not delay in pursuing the surcharge after it became responsible under the Master Agreement in January 2005.  For these reasons, the Court concludes that Air Liquide is entitled to recover from IWDC the surcharge owed under the Master Agreement.  However, the Court agrees with IWDC that there is enough question over the proper calculation of those damages to deny Air Liquide its complete relief on summary judgment.

### B.  ANTICIPATORY REPUDIATION CLAIM

The Court also concludes that IWDC's anticipatory repudiation claim fails.  Indiana Code § 26-1-2-610 provides:

> Sec. 610.  When either party repudiates the contract with respect to a performance not yet due, the loss of which will substantially impair the value of the contract to the other, the aggrieved party may:
>
> (a)  for a commercially reasonable time await performance by the repudiating party; or
>
> (b) resort to any remedy for breach (IC 26-1-2-703 or IC 26-1-2-711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and

(c) in either case suspend his own performance or proceed in accordance with the provisions of IC 26-1-2-704 on the seller's right to identify goods to the contract not withstanding breach or to salvage unfinished goods.

Ind. Code § 26-1-2-610.

"Repudiation of a contract must be positive, absolute, and unconditional in order that it may be treated as an anticipatory breach." *Angelone v. Chang*, 761 N.E.2d 426, 429 (Ind. Ct. App. 2001) (citing *Jay County Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 692 N.E.2d 905, 911 (Ind. Ct. App. 1998), *trans. denied*). "Because the doctrine of anticipatory repudiation represents a harsh remedy, the requirement that the repudiating statement be clear and absolute is a strict one." *Id*. "If one party to a contract, either willfully or by mistake demands of the other a performance which he has no right under the contract and states definitely that, unless his demand is complied with, he will not render his promised performance, an anticipatory breach has been committed." *Eden United, Inc. v. Short*, 573 N.E.2d 920, 929 (Ind. Ct. App. 1991).

In the case at bar, Air Liquide did not commit an anticipatory breach of its contract with IWDC by cutting IWDC out of the picture and dealing with Participating Members directly. Rather, Air Liquide merely exercised a right granted to it in paragraph 16(h) of each Supply Agreement. Def.'s MSJ Ex. 6. That paragraph provides that if IWDC fails to meet its minimum volumes, or breaches the Master Agreement, "[MG] shall, in addition to the rights available to [MG] in law or equity, have the right, in its discretion and upon notice to IWDC and Member, to have the Product Supply Agreement assigned to [MG] such that the Product Supply Agreement shall from that point forward, be a direct supply agreement between [MG] and Member . . . ." *Id.* Therefore, while Air Liquide may have disavowed its performance under the Master Agreement and effectively destroyed IWDC's contractual rights, this occurred only after IWDC failed to meet its minimum volume

28

obligations and breached the Master Agreement by not paying the surcharge.  As a result, the Court concludes that IWDC is not entitled to summary judgment on its claim of anticipatory repudiation or any damages resulting from Air Liquide's exercise of its contractual right.

## C.  ATTORNEYS' FEES

Finally, IWDC asserts that Air Liquide is not entitled to attorneys' fees.  The Court agrees. The plain language of the Master Agreement does not grant attorneys' fees in this situation.  The Master Agreement provides in paragraph 2(e):

> In the event that a Participating Member breaches the terms of its Addendum A, IWDC will, and upon request from [MG] shall[,] vigorously enforce the provisions thereof at IWDC's sole cost and expense.  If IWDC fails, in [MG's] reasonable opinion to properly enforce Addendum A, [MG] shall have the right to do so and be reimbursed by IWDC for all costs and expenses incurred (including reasonable attorneys' fees).

Def.'s MSJ Ex. 4, ¶ 2(e).

The attorneys' fees provision is inapplicable because Air Liquide has asserted a claim against IWDC because it refused to pay the surcharge owed after it failed to meet minimum volumes.  At no time has Air Liquide asserted that IWDC failed to vigorously enforce Addendum A's provisions after a Participating Member breached the relevant Supply Agreement.  Furthermore, Air Liquide itself has not enforced Addendum A against a Participating Member and does not seek reimbursement from IWDC.  The Court therefore concludes that Air Liquide is not entitled to any attorneys' fees under the Master Agreement for the present action.

## IV. **CONCLUSION**

For the foregoing reasons, the Court **DENIES** defendant/counterclaim plaintiff's, Independent Welding Distributor Cooperative, Inc., Motion for Summary Judgment on its counterclaims for breach of contract and anticipatory repudiation against plaintiff/counterclaim defendant, Air Liquide America L.P., and **GRANTS in part and DENIES in part** plaintiff/counterclaim defendant's, Air Liquide America, L.P., Motion for Summary Judgment. The issue of damages owed plaintiff/counterclaim defendant, Air Liquide America, L.P., remains for trial.

IT IS SO ORDERED this 18th day of June, 2008.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Electronically distributed to:

Adam Arceneaux
ICE MILLER LLP
adam.arceneaux@icemiller.com

Brian Edward Bailey
ICE MILLER LLP
brian.bailey@icemiller.com

Frederick D. Emhardt
PLEWS SHADLEY RACHER & BRAUN
emhardt@psrb.com

Jeffrey D. Featherstun
PLEWS SHADLEY RACHER & BRAUN
jfeather@psrb.com

Nicholas A. Gowen
SCHOPF & WEISS LLP
gowen@sw.com

Melanie E. Harris
ICE MILLER LLP
melanie.harris@icemiller.com

Arthur James Howe
SCHOPF & WEISS LLP
howe@sw.com

Kevin M. Kearney
HODGSON RUSS LLP
kkearney@hodgsonruss.com

Robert John Palmersheim
SCHOPF & WEISS LLP
palmersheim@sw.com

Jeffrey Charles Stravino
HODGSON RUSS LLP
jeff_stravino@hodgsonruss.com